## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

KEVIN R.,

      Plaintiff,

v.                                    CIVIL ACTION NO. 2:22-cv-00351

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Kevin R. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. By standing order entered on January 4, 2016, and filed in this case on August 24, 2022, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Pending before this Court are Claimant's Memorandum in Support of His Motion for Judgment on the Pleadings, and the Commissioner's Brief in Support of Defendant's Decision. (ECF Nos. 9; 10.) Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision, **GRANT** the Commissioner's request to affirm her decision, **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.   BACKGROUND

### A.  Information about Claimant and Procedural History of Claim

The Claimant in this matter was 28 years old at the time of his alleged disability onset date, and 34 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr.[1] 32, 240.) Claimant completed a GED certification in 2006, and has worked in the past as a fast-food worker, a truck driver, a retail cashier, an automobile salesclerk, and a retail salesclerk. (Tr. 245-46.) Claimant alleges that he became disabled on April 22, 2016, due to several mental-health impairments—post-traumatic stress disorder ("PTSD"), anxiety, panic attacks, agoraphobia, and memory problems—as well as physical impairments—a sleep disorder, diabetes mellitus, and nerve damage in both his right wrist and his lower back.  (Tr. 240-244.)

Claimant filed an application for benefits with the Social Security Administration (hereinafter the "Agency") on July 31, 2019. (Tr. 224.) His claim was initially denied on January 22, 2020, and again upon reconsideration on May 20, 2020. (Tr. 102-115, 119, 131-137.) Thereafter, on July 15, 2020, Claimant filed a written request for hearing. (Tr. 138-139.) An administrative hearing was held telephonically before an ALJ on October 26, 2021, in Charleston, West Virginia. (Tr. 37-65.) On November 3, 2021, the ALJ entered an unfavorable decision. (Tr. 12-36.) Claimant then sought review of the ALJ's decision by the Appeals Council on November 19, 2021. (Tr. 4-5.) The Appeals Council denied Claimant's request for review on June 27, 2022, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-7.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 8.

Claimant brought the present action on August 24, 2022, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer and a transcript of the administrative proceedings on October 28, 2022. (ECF Nos. 7; 8). Claimant subsequently filed his Memorandum in Support of His Motion for Judgment on the Pleadings on November 28, 2022, and in response, the Commissioner filed her Brief in Support of Defendant's Decision on December 13, 2022. (ECF Nos. 9; 10.) Accordingly, this matter is now fully briefed and ripe for adjudication.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments, and summarizes the relevant portions here for the convenience of the United States District Judge.

#### 1. Physical Impairments

##### a. Right Wrist

In March 2016, Claimant injured his right wrist at work. (Tr. 293.) Diagnostic images were performed in April 2016. (Tr. 941, 1029.) While the x-ray imaging was negative, the MRI indicated the presence of mild edema; however, the MRI indicated that Claimant's fibrocartilaginous labrum, as well as the carpal ligaments and tendons, were intact. *Id.* In June 2016, Claimant presented for an electromyography ("EMG")—which measures the electrical activity produced by skeletal muscles—and the results were normal. (Tr. 980.) Claimant was diagnosed with a right-wrist sprain, and between June and September 2016, he was treated with various medications and injections, as well as physical therapy; additionally, he was prescribed a wrist splint to wear. (Tr. 1010, 1063.) During this time Claimant continued to complain of right-wrist pain and displayed some difficulties making a fist; on examination, however, Claimant exhibited

full strength, intact sensation, and a normal range of motion. (Tr. 935, 1004-05, 1031-32, 1049-50, 1076-77, 1063.)   In October 2016, another EMG was performed on Claimant's right wrist, which again reflected normal findings. (Tr. 848.) While the attending orthopedic physician released Claimant to return to "full duty work" at that time, Med Express requested that Claimant be referred for a neurology consultation. *Id.* Accordingly, Claimant was referred to a hand specialist. *Id.*

Claimant presented to the hand specialist in January and February 2017, where on examination he exhibited a full range of motion with his wrist, as well as normal strength. (Tr. 806-07, 830-31.) His treating provider wrote in Claimant's treatment notes that "[s]ymptom exaggeration" was "present," because "[t]he symptoms he describe[d] and the severity ha[d] no relation to his work injury." (Tr. 831.) The provider explained to Claimant that he had "mild" carpal tunnel syndrome, and recommended a neurology consultation to "get cleared from any neurological diagnosis." *Id.*

Claimant presented for his neurology consultation in September 2017, where an updated EMG reflected ulnar neuropathy; accordingly, Claimant was referred to surgery. (Tr. 831, 1112.) Despite this referral, however, Claimant did not attend another medical appointment for his right wrist for the next several months. In May 2018, Claimant reported experiencing "intermittent" pain in his right wrist. (Tr. 1084.) The following month in June 2018, Claimant displayed 4/5 strength in his right wrist, and stated to his treating provider that he was "scheduled for surgery with Dr. Jackson next week." (Tr. 760-62.) However, the record is unclear as to whether the surgery took place. *See id.* Claimant occasionally complained of right wrist pain at subsequent medical appointments in September 2018, September 2019, and December 2019, but the record

does not indicate significant treatment, and physical examinations did not reflect significant issues with his right upper extremity. (Tr. 729, 1094-97, 1100-03.)

### b. Lumbar Spine

Claimant injured his back at work on July 31, 2009, causing symptoms of back pain radiating from his lower back into his right hip and right leg. (Tr. 503.) Claimant reported that he had an MRI, and was informed that he had a bulging disc. *Id.* He was seen by a neurosurgeon, but surgery was not recommended at that time. *Id.*

In 2017, Claimant reported that his back pain had returned. Claimant treated this back pain conservatively during the relevant time period, with some improvement in his symptoms. First, Claimant presented for a neurology consultation in September 2017. (Tr. 1109.) Claimant reported that he had experienced back pain for the previous two years. (Tr. 1109-10.) While his back pain had improved with physical therapy, Claimant stated that over the previous few months the pain returned and began to increase. (Tr. 1109-10.) He denied any weakness or problems with ambulation, and on examination he exhibited normal muscle strength in both his upper and lower extremities. *Id.* However, a diagnostic EMG indicated that Claimant had radiculopathy of the L5-S1 vertebrae. (Tr. 1110-1115.)

In May 2018, Claimant began pain-management treatment at Neurology and Headache Clinic for his back pain. (Tr. 1109.) On physical examination, Claimant was found to have tenderness, muscle spasms, an abnormal range of motion, lower-extremity weakness secondary to pain, and an antalgic gait; accordingly, he was diagnosed with right-hip pain and lumbosacral spondylosis. (Tr. 1086-87.) Neurology records from the following month in June 2018 indicated that Claimant continued to report chronic lumbar-spine pain, supported by decreased sensation to light touch in the lower

extremities. (Tr. 760-62.) He was diagnosed with lumbar radiculopathy, as well as diabetes mellitus type two, with polyneuropathy. (Tr. 762.) However, Claimant exhibited normal gait and station, with 5/5 strength in his lower extremities. (Tr. 760-62.) In fact, he was observed to ambulate normally at every appointment beginning in September 2018 through the remainder of the relevant time period. (Tr. 535, 541, 546, 551, 556-561, 566, 572-73, 641, 647, 653, 659, 665, 671, 677, 683, 691, 711.)

The following year in January 2019, Claimant continued to exhibit tenderness and reduced range-of-motion of the lumbar spine on examination. (Tr. 726.) Claimant was diagnosed with chronic low-back pain, and his treating provider recommended scheduling him for lumbar spine injections; however, Claimant did not receive the injections due to his medical insurer's failure to approve them. *Id.* Claimant was prescribed Gabapentin—a nerve-pain reducer—as well as Tizanidine, a muscle relaxant. *Id.* Later in December 2019, Claimant was seen again for back pain with lower-leg radicular symptoms and right-leg weakness, resulting in falls. (Tr. 729.) Claimant reported difficulty with pain-medication compliance in 2019 as to his Gabapentin and hydrocodone prescriptions. (Tr. 699, 735.) The following month on January 3, 2020, Claimant underwent medial-branch blocks from the L3-L4 vertebrae to the L5-S1 vertebrae. (Tr. 1106.) However, these spinal injections did not show a significant improvement of his symptoms. (Tr. 1107.)

Three months later in April 2020, Claimant was still ambulating normally; however, he reported experiencing numbness and tingling in his legs, as well as falls. (Tr. 740.) An updated lumbar-spine MRI was ordered, but was never performed due to Claimant's issues with wearing a mask. (Tr. 741, 755.) The following month in May 2020, Claimant continued to report severe and persistent back pain; his treating provider noted

6

that a "neurosurgery referral *may* be necessary," but her treatment plan recommended deferring for three months and then following up on that issue. (Tr. 738.) However, at telehealth appointments in July and September 2020, while Claimant continued to report an increase in symptoms, his treatment regimen remained unchanged pending the updated lumbar spine MRI. (Tr. 740, 755.)

   *2. Mental Impairments*

   Claimant's mental-health treatment has been conservative and generally limited to prescription medication and outpatient counseling; there is no evidence of any inpatient treatment or hospitalizations due to mental-health issues during the relevant time period. Between August 2015 and March 2020, Claimant treated at Prestera Center for social anxiety, generalized anxiety, panic attacks, depression, and PTSD, along with associated reported symptoms of depressed and anxious mood, irritability, crying spells, anhedonia, poor energy, sleep, concentration, and memory, as well as restlessness, recurrent suicidal ideation, and nervousness around other people. (Tr. 513, 529, 562, 570, 571-598, 634-694.) However, Claimant's mental-status examinations consistently indicated that Claimant's behavior was cooperative, and that he exhibited normal speech, a logical thought process, normal thought content, normal perception, focused attention and concentration, proper orientation, normal memory, and at least fair insight and judgment. (Tr. 535, 541, 546, 551, 556, 561, 566, 572-73, 641, 647, 653, 659, 665, 671, 677, 683, 691.) Additionally, the providers who treated Claimant's physical impairments consistently characterized Claimant's mental status as unremarkable, with normal orientation, memory, attention span, concentration, and fund of knowledge. (Tr. 594-95, 711, 762, 1110.)

3.  *Opinion Evidence*

   a.  *Physical Impairments*

On September 1, 2017, Claimant presented for a consultative internal-medicine examination of his right wrist and lumbar spine by Kip R. Beard, M.D. (Tr. 764.) With respect to Claimant's lumbar-spine, x-ray imaging was found to be normal. (Tr. 777.) On examination, Claimant was observed to use no ambulatory aids; additionally, Claimant exhibited a stable gait and station, and was able to heel walk, toe walk, tandem walk, stand on one leg, and squat fully. (Tr. 767.) Claimant displayed no symptoms of pain on the left leg with a supine leg raise, but he was observed to have some pain on the right leg. (Tr. 770.) Claimant had a negative seated-straight-leg raise. *Id*. Claimant was observed to have normal strength throughout all of his extremities, and he exhibited a normal range of motion in his extremities except for his right wrist. (Tr. 771-74.)

With respect to Claimant's right wrist, he was unable to make a full fist with his right hand; additionally, he exhibited reduced sensation and range of motion. (Tr. 771-74.) However, Claimant was able to extend his fingers, oppose his thumbs, write with his dominant-right hand, pick up a coin with either hand, and tie a string and button using both hands. (Tr. 771.) Claimant also had full strength in his wrists and 4/5 strength regarding his right grip. (Tr. 774). Dr. Beard concluded that Claimant's "ability to perform physical work-related activities appears impaired for prolonged or repetitious use of the right upper extremity, in addition to repetitive gripping or grasping." (Tr. 775-76.)

In February 2019, Leon Ronen, M.D.—Claimant's treating physician—opined that Claimant could sit for eight hours and stand/walk for four hours out of an eight-hour workday with frequent breaks. (Tr. 720.) Additionally, he opined that Claimant could lift/carry up to ten pounds frequently, and up to twenty-five pounds occasionally. *Id*.

Dr. Ronen further opined that Claimant could not use his hands repetitively for fine manipulation or for pushing and pulling of arm controls; nor could he repetitively operate leg controls. (Tr. 720-21.) Next, Dr. Ronen opined that Claimant had total restriction to unprotected heights, moderate restriction to vibration exposure, and mild limitations to being around moving machinery, exposure to marked changes in temperature and humidity, and driving automotive equipment. (Tr. 721.) Dr. Ronen also opined that Claimant had a slight impairment to sustained concentration or attention. (Tr. 722.) Finally, Dr. Ronen opined that Claimant could perform sedentary work, but would need frequent breaks; however, he qualified this opinion with the statement that his assessment "was done without a functional capacity evaluation." (Tr. 723.)

Finally, state-agency medical consultants Robert Mogul, M.D., and Amy Wirts, M.D., both found that Claimant could lift twenty-five pounds occasionally and ten pounds frequently; additionally, they both found that Claimant could sit for six hours and stand or walk for six hours out of an eight-hour workday. (Tr. 95, 111.) Additionally, they found that Claimant could frequently stoop, balance, and crouch, as well as occasionally climb, kneel, and crawl. (Tr. 95-96, 111.)

### b. Mental Impairments

On May 31, 2017, licensed psychologist Angela Null, M.S. performed a consultative examination of the Claimant on behalf of the Agency, which consisted of a clinical interview, mental status examination, and a review of records. (Tr. 507.) Claimant reported he was able to perform basic living duties independently, including cooking and taking care of his hygiene, though he often received assistance with household chores from his mother or a friend. (Tr. 511.) He reported that he was able to attend scheduled medical appointments, manage his finances, and maintain a checking account

independently. *Id.* His daily routine included feeding his cat, watching television or Netflix, and preparing simple meals. *Id.* Claimant reported that he went to the grocery store and ran other errands monthly, but that he did not exercise and only rarely went out to eat, visited family or friends, or talked on the telephone. *Id.* He reported that he had not engaged in his hobbies of hunting and fishing since 2015. *Id.*

Ms. Null observed that Claimant was polite and cooperative, showed intact judgment, connected thought process, logical and coherent speech, proper orientation to person, place, date, and time, and intact insight in response to questions regarding social awareness. (Tr. 509.) There was no indication of obsessions, compulsions, or paranoid ideation, and no indication of unusual perceptual experiences. *Id.* Claimant's psychomotor behavior was generally within normal limits. *Id.* His immediate memory was intact, with 4/4 words recalled immediately; additionally, his recent memory was grossly intact, with 4/4 words recalled after a five-minute delay when offered multiple prompts, and his remote memory was intact based upon his ability to recall details of his personal history. (Tr. 509-510.) Claimant's concentration and persistence were grossly intact, and his pace was normal. *Id.* However, Ms. Null also observed that Claimant had a dysphoric mood with an affect on the verge of tears at times, and Claimant reported occasional suicidal ideation. (Tr. 509.) Additionally, Ms. Null observed that Claimant's social functioning during the evaluation was moderately deficient based on clinical observations of social interactions such as eye contact, mannerisms, sense of humor, and appearance. (Tr. 510.)

Ms. Null diagnosed (1) major depressive disorder, recurrent, moderate; (2) somatic symptom disorder with persistent pain, moderate; (3) attention deficit hyperactivity disorder ("ADHD"), predominantly inattentive type; and (4) alcohol use

disorder, moderate, in partial remission. (Tr. 510-11.) In support of these diagnoses, Ms. Null stated that Claimant presented with recurrent depressive episodes characterized by feelings of sadness and hopelessness, isolation, decreased motivation, loss of interest in pleasurable activities, decreased sleep, crying spells, fatigue, and history of a suicide attempt in 2007. (Tr. 510.) Ms. Null stated that Claimant's pain "causes clinically significant disturbances in social, occupational, and daily functioning." *Id.* Additionally, Claimant presented with symptoms of ADHD including disorganization, losing things frequently, impulsivity, difficulty completing tasks, fidgeting and restlessness, difficulty falling asleep, talking excessively, interrupting, becoming easily frustrated and impatient, and avoiding tasks which require sustained mental effort. *Id.*

On January 14, 2020, Melinda Henline, M.A., performed a second consultative examination of the Claimant. (Tr. 600.) During the interview, Claimant reported he was disabled due to depression, anxiety, PTSD, agoraphobia, obsessive-compulsive disorder ("OCD"), bad memory, and a sleep disorder. *Id.* In support of these claimed impairments, Claimant reported symptoms of loss of interest in activities, disturbed sleep, feelings of helplessness, pessimism, guilt, worthlessness, and anger, as well as crying episodes. (Tr. 604.) Following a mental status examination, Ms. Henline found indications of a depressed mood, a restricted affect, and memory problems including mildly-impaired immediate, recent, and remote memory, as well as a moderate impairment in concentration. (Tr. 603-04.) Aside from these issues, however, Claimant exhibited normal appearance, behavior, speech, orientation, thought process, thought content, perception, judgment, insight, psychomotor behavior, concentration, persistence, and pace. *Id.* Ms. Henline diagnosed Claimant with major depressive disorder, recurrent, moderate, as well as PTSD, agoraphobia, panic disorder, and OCD. (Tr. 604.)

On January 21, 2020, state-agency psychological consultant Joseph Richard, Ed.D. completed a mental-residual-functional-capacity assessment of Claimant. (Tr. 98.) Mr. Richard found that Claimant had the ability to complete work-like activities, understand and remember one-to-three-step instructions—but not detailed and complex instructions—and to carry out one-to-three-step tasks—but not detailed tasks. (Tr. 98.) Further, he found that Claimant could attend to tasks for up to two-hour periods at a time throughout an eight-hour workday, with a minimal production quota. *Id.* Additionally, Mr. Richard found that Claimant may have difficulty relating to the public and coworkers, accepting supervision, and dealing appropriately with criticism. *Id.* Finally, he found that Claimant could manage stress, adjust to a "task" setting, and deal with normal changes once he was familiar. *Id.*

Finally, state-agency psychological consultant Jeff Boggess, Ph.D., found that Claimant needed "a work setting that is considered detailed, but not complex, work not requiring a fast assembly quota pace . . . work involving only occasional required work interactions with coworkers, supervisors, and the public, and work tolerating off-task behavior of up to three percent of the workday." (Tr. 74, 113.)

   *4.  Hearing Testimony*

At the October 26, 2021 administrative hearing, the ALJ questioned Claimant regarding his activities of daily living. The Claimant testified that he was divorced and lived at home by himself. (Tr. 55-56.) He confirmed that he had a driver's license and drove approximately fifty miles or less in an average week. (Tr. 56.) Claimant testified that he experienced "severe back pain" during the first half of a typical day as well as "a little difficulty sleeping" at night, and "ha[d] assistance with" most of his household tasks such as cleaning dishes. (Tr. 57-58.) However, Claimant confirmed that he was able to take care

of his personal hygiene, prepare frozen food for himself, and do some light chores. (Tr. 58.) For entertainment, Claimant testified that he liked to read, use the Internet, and watch Netflix, though he frequently had to "replay certain sections or rewind certain things" in order to follow a show. (Tr. 58-59.) Claimant confirmed that he occasionally went on shopping trips, such as going to his local grocery store, but tried to minimize the length of these excursions to less than thirty minutes because "otherwise, [he would] start getting shaky and have trouble talking." (Tr. 59.) Next, Claimant testified that he had "frequent difficulty sleeping" and slept for a maximum of two hours per night on average, with only occasional napping during the day. (Tr. 60.) Claimant stated that as a result of only sleeping for two hours per night, every month or so he would sleep for a period of approximately sixteen hours. *Id*. The ALJ also questioned Claimant about the difference between his 2017 assessment by Ms. Null and his 2020 assessment by Ms. Henline, but Claimant stated that he was not aware of any event or change in his mental-health condition between 2017 and 2020. *Id*. The ALJ concluded his questioning by asking the Claimant to opine what would prevent him from "working a 40 hour week job." *Id*. In response, Claimant testified that walking around a large retail store caused him to have "sharp pains" spanning from his back down to his leg. (Tr. 60-61.)

Following the ALJ's questioning, Claimant's counsel had an opportunity to ask questions. Claimant testified in response to his counsel's questioning that he had severe problems with his right hand, and even writing out his signature would cause his wrist to hurt. (Tr. 61.) As a result, Claimant wore a prescription wrist brace most of the time, which limited his movement and made grabbing objects difficult. *Id*. Additionally, Claimant testified that he did not venture out to the grocery store during busy periods in order to avoid being around other people. (Tr. 62.) Finally, Claimant testified that whenever he

read, he needed to read a page two or three times before moving on due to forgetfulness or inattention. (Tr. 62-63.)

In addition to Claimant's testimony, the ALJ also heard testimony from medical expert David Owens, M.D., a family physician, regarding Claimant's physical functional limitations. (Tr. 43.) Dr. Owens opined that, while Claimant's physical impairments did not meet or equal a specific listing, Claimant would be capable of "no more than light duty activity" due to his functional limitations. (Tr. 44.) Specifically, Dr. Owens opined that Claimant would be capable of lifting and carrying twenty pounds occasionally and ten pounds frequently; could sit for six hours in an eight-hour day; could stand and/or walk for six hours in an eight hour day; could climb ramps and stairs occasionally; and could balance, bend, stoop, crouch, and crawl occasionally. (Tr. 44-45.) Dr. Owens further testified that because of Claimant's wrist problems—and, to a lesser extent, his back problems—Claimant only occasionally could climb ropes, ladders, and scaffolding. (Tr. 45.) Furthermore, Claimant could use foot controls frequently as well as left-side hand controls, and on the right side, could frequently engage in fine-motor or manipulation like fingering, feeling, and touching; however, Claimant would have trouble with, and thus could only occasionally, grasp, push, pull, or reach in all directions. *Id.* Dr. Owens also opined that Claimant would have to avoid excessive vibrations because of his spine condition. *Id.* Finally, in response to questioning from Claimant's counsel, Dr. Owens opined that Claimant would have difficulty firmly grasping anything heavy, and that Claimant's use of a wrist brace was likely helpful and reasonable. (Tr. 46.)

Next, the ALJ heard testimony from medical expert Jeff Fremont, Ph.D., a psychologist, regarding Claimant's mental functional limitations. (Tr. 46.) Dr. Fremont opined that Claimant had depression, anxiety, and post-traumatic stress disorder

14

("PTSD"), but that Claimant's mental impairments did not meet or equal any listing because Claimant's "cognitions really have not been terribly affected." (Tr. 49-50.) Dr. Fremont opined that Claimant's "B criteria" was mostly mild, except that Claimant's ability to interact with others was "between mild and moderate." (Tr. 50.) As to Claimant's memory, Dr. Fremont opined that Claimant could make decisions and carry out simple tasks because "his cognitions are really very much intact for the most part, especially on the treatment notes." *Id.* Dr. Fremont added that he did not think Claimant would have any "major difficulties, unless he was given very complex problems to solve." *Id.* Finally, in response to questioning from Claimant's counsel, Dr. Fremont testified that Claimant's agoraphobia was "not well supported at all," and at best would only be "an issue" periodically. (Tr. 51.)

Finally, the ALJ employed a vocational expert ("VE") at the hearing to aid him in determining whether Claimant could perform past relevant work or other work.  (Tr. 51-54.)  First, the VE classified Claimant's past relevant work, testifying that Claimant's past work as a fast-food worker was light and unskilled; Claimant's past work as a truck driver was medium and semi-skilled; Claimant's past work as a retail cashier was a light, semi-skilled position; Claimant's past work as an automobile salesclerk was light and skilled; and Claimant's past position as a retail salesclerk was light and semi-skilled. (Tr. 52.) The ALJ next asked the VE to assume that a hypothetical individual was the same age as Claimant, with the same educational and vocational profile, and had the following limitations:

the individual is limited to light work; all postural tasks could be performed on an occasional basis except that the individual should not use ladders, ropes, or scaffolding; food controls and left-side hand controls could be performed frequently; right-side hand controls could be done frequently with respect to handling, feeling, gripping, and fingering, but gripping and reaching, pushing, and pulling could only be performed on an occasional basis; and the individual should avoid concentrated exposure to vibration.

(Tr. 53.) The VE testified that all Claimant's past work would be eliminated for the hypothetical individual under these circumstances, but the hypothetical individual would be able to perform a limited range of light, entry-level, unskilled jobs such as "parking lot booth attendant" and "restaurant host." (Tr. 53-54.) Finally, the ALJ asked the VE how his answer would be affected if the hypothetical individual "would be off task 25% of a typical workday or workweek outside of breaks or lunch," and the VE testified that "[t]he individual would not be able to work any full-time competitive job." (Tr. 54.)

Claimant's counsel also questioned the VE regarding the ALJ's first hypothetical. In response to counsel's questioning, the VE testified that if the individual were required to wear a brace to support his dominant right hand, the brace would not affect his ability to perform the jobs that the VE previously listed. (Tr. 63.) Additionally, the VE testified that if the individual would have difficulty relating to the public and coworkers, accepting supervision, and dealing appropriately with criticism, the individual would need a sheltered workshop and/or isolated employment. *Id.* Finally, the VE testified that if the individual would require a break "frequently"—a duration of one-third to two-thirds of the workday—that would mean the individual would be off task for sixty percent of the day, and therefore he could not work on a full-time, competitive basis. (Tr. 64.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically-determinable physical and mental impairments, from the available medical evidence. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment—or combination of impairments—that is not classified as "severe," and does not satisfy the durational requirements, will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment—or combination of impairments—meets or is medically equal to the criteria

of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "h[is] ability to perform work despite h[is] limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work") (alterations and internal quotation marks omitted). *See* also 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). To make an RFC determination, the ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe," as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* also 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special

technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see also Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. *See* 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see also* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If he does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him

"not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot perform other work, the ALJ will find him "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ determined at the first step that Claimant had not engaged in substantial gainful activity since April 22, 2016—the alleged onset of his disability—through December 31, 2020, the date last insured. (Tr. 17.) At the second step, the ALJ found that Claimant's mental impairments did not cause more than minimal limitation in Claimant's ability to perform basic mental work activities and were therefore non-severe; however, the ALJ found that Claimant's physical impairments of a back disorder, radiculopathy, right wrist disorder, ulnar neuropathy, diabetes mellitus, and obesity, constituted "severe" impairments. (Tr. 18.) At the third step, the ALJ found that Claimant's severe impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20.)

Next, before turning to the fourth step, the ALJ determined Claimant's RFC and found that Claimant could perform "light work as defined in 20 C.F.R. § 404.1567(b)," except for the following limitations:

> Claimant could never climb ladders, ropes, and scaffolds. He could occasionally perform the remaining postural activities, meaning he could occasionally climb ramps and stairs, occasionally balance, occasionally stoop, occasionally kneel, occasionally crouch, and occasionally crawl. He could frequently operate foot controls. He could frequently operate hand controls on the left hand. He could frequently operate hand controls, finger, handle, and feel with the right hand. He can occasionally grip, push, pull, and reach with the right hand. He must avoid concentrated exposure to vibration.

(Tr. 22.) At the fourth step, the ALJ concluded that, given the limitations imposed by the Claimant's RFC and the VE's testimony, Claimant was unable to perform his past relevant work through the date last insured. (Tr. 31.)

Finally, at the fifth step, The ALJ noted that Claimant was "a younger individual" with "at least a high school education," and that "[t]ransferability of job skills [wa]s not material to the determination of disability[.]" *Id.* Because the ALJ determined that Claimant was unable to perform the full range of light work, he enlisted a VE to aid in his finding that Claimant is capable of performing the requirements of other work, including "representative occupations" such as a parking booth attendant, school bus monitor, and restaurant host. (Tr. 32.) As a result, the ALJ concluded that the Claimant was not "under a disability . . . at any time from April 22, 2016, the alleged onset date, through December 31, 2020, the date last insured." *Id.*

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.*

"[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Thus, even if "reasonable minds [could] differ as to whether a claimant is disabled," this

Court must uphold the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589). In undertaking this review, the Court's role is merely to consider whether the ALJ examined all relevant evidence and offered a sufficient rationale in crediting certain evidence and discrediting other evidence. *Cannon v. Comm'r of Soc. Sec. Admin.*, 21-2042, 2023 WL 2147306, at *6 (4th Cir. Feb. 22, 2023) (citing *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998)).

## III.    ANALYSIS

Claimant's assertions of error are twofold. (ECF No. 9 at 1.) First, Claimant argued that the ALJ failed to properly evaluate Claimant's mental impairments. *Id.* Second, Claimant argued that the ALJ improperly assessed his RFC. *Id.* In response, the Commissioner denied Claimant's arguments and asserted that the ALJ's RFC determination was proper and well-supported by substantial evidence. (ECF No. 10.) For the reasons set forth below, Claimant's arguments lack merit under the circumstances of this case.

### A. Evaluation of Claimant's Mental Impairments

Claimant's first assignment of error stated that the ALJ failed to properly evaluate Claimant's mental impairments. (ECF No. 9 at 6.) Claimant did not dispute the ALJ's finding at the second step that Claimant's mental impairments were non-severe; however, Claimant challenged the ALJ's subsequent RFC assessment, arguing that the ALJ failed to account for these non-severe impairments in formulating Claimant's RFC. *See id.* at 6-9. In support of his argument, Claimant first explained that the ALJ deemed Claimant's non-severe mental impairments to have caused "mild" limits in understanding remembering, or applying information, as well as mild limits in concentration, persistence, or pace—yet the ALJ "failed to include these limitations in [Claimant's] RFC

finding." *Id.* at 9. Claimant explained that "[e]ven a non-severe impairment can put a disproportionately greater strain on a person who concurrently is suffering from a more severe affliction," and therefore an ALJ is required to consider the impact of a claimant's non-severe mental impairments in combination with his severe impairments in formulating the claimant's RFC. *Id.* at 8-9 (quoting *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010)). Additionally, Plaintiff explained that Agency regulations required the ALJ to "consider the combined effect of all of [a claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." (ECF No. 9 at 7 (citing 20 C.F.R. § 404.1523; SSR 96-8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.")).). Because the ALJ's RFC did not include any limits in mental-health functioning at all, Claimant argued that the ALJ failed to meet this obligation. (ECF No. 9 at 7.)

Claimant is correct that, as part of the RFC assessment, the ALJ must evaluate the claimant's "ability to perform work despite h[is] limitations" in light of "'all' relevant record evidence." *Patterson*, 846 F.3d at 659 (citing 20 C.F.R. § 404.1520(e)). In doing so, "the ALJ [is] required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant." *Blankenship v. Astrue*, 3:11-cv-00005, 2012 WL 259952, at *12 (S.D. W. Va. Jan. 27, 2012) (citing *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989)).

This Court's determination in a 2021 case is instructive. *See Shank v. Saul*, 3:20-cv-444, 2021 WL 2467063 (S.D. W. Va. Jun. 11, 2021), *adopted*, 2021 WL 2744550 (S.D. W. Va. Jul. 1, 2021). Just like the Claimant in the instant matter, the claimant in *Shank*

was found by the ALJ to have non-severe mental impairments, with only mild functional limitations. *Id.* at *8. However, after finding these impairments were non-severe at the second step of his analysis, the ALJ in *Shank* did not go on to include a discussion of the claimant's non-severe mental impairments when he subsequently formulated the claimant's RFC; instead, the ALJ merely cited his findings at step two. *Id.* The Court found that the ALJ's RFC assessment in *Shank* was not supported by substantial evidence. *Id.* Specifically, the Court explained that the ALJ's "boilerplate statement" merely pointing to his step-two findings was "an insufficient substitute for substantive analysis," because the ALJ did not "provide any insight into why he did not assess any mental RFC restriction," and therefore failed to "provide the level of articulation necessary for meaningful review." *Id.* at *8-9.

The Court's concerns in *Shank* are not present in the instant matter. Unlike the *Shank* ALJ, whose RFC assessment merely pointed to the ALJ's step-two findings, here the ALJ's RFC assessment went beyond step two and included an appropriate narrative discussion that provided direct insight into why the ALJ did not assess any mental RFC limitations, with specific citations to the supporting evidence. (Tr. 27-28.) Specifically, when discussing his RFC determination, the ALJ expressly—and extensively—explained how he considered Claimant's non-severe mental-health impairments, and why the opinion evidence supported his conclusion that no further mental limitations were necessary. (Tr. 27-28.)

First, the ALJ pointed to Dr. Fremont's testimony where he opined that, despite Claimant's anxiety, depression, and PTSD, the Claimant "could perform simple tasks without issues unless he was given 'very complex' problems." (Tr. 27.) The ALJ further discussed Dr. Fremont's opinion as follows:

> [The] opinions of Jeffrey Fremont, Ph.D., [are] persuasive. Dr. Fremont
> reviewed the record and provided a detailed analysis orally at the
> hearing. Dr. Fremont noted the claimant underwent two consultative
> examinations wherein his memory appeared to worsen without apparent
> reason [(Tr. 509, 603-04)]. [The ALJ] questioned the claimant related to
> this discrepancy in memory; however, there was no explanation as to why
> his memory would have deteriorated. The claimant described always
> having a bad memory [(Tr. 48)]. Dr. Fremont noted the claimant was
> diagnosed with a depression and somatic symptom disorder and an
> indication of attention-deficit hyperactivity disorder (ADHD) [(Tr. 510)].
> Dr. Fremont noted his alcohol use was in partial remission [(Id.)]. Dr.
> Fremont noted that in 2018, the claimant was diagnosed with depression,
> post-traumatic stress disorder (PTSD), social anxiety, and alcohol in
> remission [(Tr. 520)]. Dr. Fremont noted differences in the claimant's
> performance at the second consultative examination as well as the
> corresponding diagnoses, including alcohol use in remission. Dr. Fremont
> noted all cognitions were within reasonable limits in the treatment records
> from November of 2019 [(Tr. 677)]. Dr. Fremont opined the claimant had
> depression, anxiety, and posttraumatic stress disorder (PTSD) as
> impairments. Dr. Fremont opined the claimant had a mild to moderate
> limitation in interacting with others and mild limitations in all other
> paragraph B areas. Dr. Fremont opined the claimant could perform simple
> tasks without issues unless he was given "very complex" problems. Dr.
> Fremont noted the claimant's agoraphobia was not well supported at all
> based on the claimant's ability to go the store a few times per month, which
> he described as not consistent with agoraphobia. Dr. Fremont noted the
> record did not discuss either improvement or deterioration with regard to
> the claimant's mental health impairments.

(Tr. 27.) Based upon his review of the record and Dr. Fremont's testimony, therefore, the

ALJ found that "performance of very complex problems or tasks is not more than a

minimal limitation, consistent with Dr. Fremont's opined mild limitation in

understanding, remembering, or applying information." *Id.* Accordingly, "reviewing Dr.

Fremont's testimony, no more than minimal limitations are supported[.]" *Id.* The ALJ

explained that his finding was "consistent with a longitudinal review of the claimant's

mental health treatment records and consultative examinations." (Tr. 28.)

Next, the ALJ discussed Dr. Richard's opinion that Claimant had "severe"

psychological impairments with moderate limitations in interacting with others and

concentrating, persisting, or maintaining pace. (Tr. 28.) The ALJ explained that "[t]hese limitations are simply not supported by Dr. Richard's discussion of the record and are inconsistent with the claimant's longitudinal performance." *Id.* In support of this statement, the ALJ pointed to record evidence that "the claimant performs activities such as going to the store, running errands, and attending medical appointments and has generally presented unremarkably within mental health treatment records." *Id.* (citing Tr. 507-512, 513-598, 600-607, 608-694). The ALJ acknowledged that Claimant had mood complaints, but explained that those complaints did not result in more than "mild level limitations." (Tr. 28.)

Contrary to Claimant's argument, therefore, the ALJ *did* consider Claimant's non-severe mental impairments in detail when formulating Claimant's RFC, but based upon the evidence the ALJ determined that these impairments were too negligible to support additional RFC limitations. *See id.* The ALJ here did refer to his discussion at the second step to demonstrate evidentiary support for this finding, but unlike the ALJ in *Shank*, the ALJ's analysis was far more fulsome and did not merely rely upon his step-two discussion alone. Accordingly, based upon the ALJ's thorough review and express citation to support in the record, the undersigned **FINDS** that the ALJ's evaluation of Claimant's mental impairments was proper and was supported by substantial evidence.

### B. *Assessment of Claimant's RFC*

Claimant's second and final assignment of error concerned the portion of the ALJ's RFC determination that found the Claimant had a sufficient capacity to perform light work with occasional postural limitations and frequent manipulative limitations. (ECF No. 9 at 9.) Claimant asserted that the ALJ's RFC determination was not supported by substantial evidence because the ALJ did not set out his rationale for the postural or

manipulative limitations in his RFC findings. *Id*. Specifically, Claimant argued that the ALJ's description of "light work" as defined in 20 C.F.R. §404.1567(b) "d[id] not constitute an RFC pursuant to Agency requirements," and that "the ALJ failed to make any findings as to the maximum amount of time [Claimant] could sit, stand, or walk" as required by SSR 96-8p *Id*. at 10.

As part of his RFC assessment, the ALJ must evaluate the claimant's "ability to perform work despite her limitations" in light of "'all' relevant record evidence." *Patterson*, 846 F.3d at 659 (citing 20 C.F.R. § 404.1520(e)). In doing so, "the ALJ [is] required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant." *Blankenship v. Astrue*, 3:11-cv-00005, 2012 WL 259952, at *12 (S.D.W. Va. Jan. 27, 2012) (citing *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989)). "The ailments should not be fractionalized and considered in isolation; instead, their cumulative effect should be analyzed to determine the totality of their impact on the claimant's ability to engage in basic work activities." *Id*. (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). "In the RFC assessment, the ALJ uses all relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). Stated another way, "the ALJ must both identify evidence

that supports his conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis deleted) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

Claimant's argument in this case recently was rejected by this Court in a similar case. *See Conner v. Kijakazi*, 3:21-CV-00022, 2022 WL 873682, at *8 (S.D. W. Va. Mar. 7, 2022), *adopted*, 2022 WL 866271 (S.D. W. Va. Mar. 22, 2022). In *Connor*, the Court found that an ALJ's express limitation of the claimant's RFC to light work "not only implicitly includes a finding that [the claimant] could stand or walk off and on for a total of approximately six hours of an eight-hour workday," but in fact "expressly indicates that the [claimant] can perform light work as defined in 20 C.F.R. § 404.1567(b)." *Id*. Accordingly, the Court found that, "[i]n light of this context . . . the ALJ's Decision did indeed explain [the claimant's] limitations regarding her ability to stand, sit, and walk." *Id*. (citing *Robinson v. Astrue*, 2:10-cv-185, 2011 WL 4368416, at *8 (D.S.C. Feb. 18, 2011), *adopted*, 2011 WL 4368396 (D.S.C. Sept. 19, 2011).

Here, the ALJ found that Claimant could perform "light work" as defined in the Agency regulations, which provide in relevant part that a claimant can lift no more than twenty pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds, and generally involves "a good deal of walking or standing." 20 C.F.R. § 404.1567(b). Additionally, SSR 83-10 explains that "the full range of light work" involves "standing or walking, off and on, for a total of approximately six hours of an eight-hour workday[,] and [s]itting may occur intermittently during the remaining time." SSR 83-10, 1983 WL 31251, at *6. Just as in *Connor*, therefore, the ALJ in this case did not err in referring to the regulation's definition of light work as a shorthand reference to Claimant's

impaired ability to sit, stand, or walk. Accordingly, the ALJ's RFC determination of "light work as defined in 20 C.F.R. § 404.1567(b)" sufficiently sets out the limitation.

Finally, the Claimant argued that the ALJ's RFC determination improperly failed to perform a function-by-function analysis, because the ALJ did not consider Claimant's functions separately. (ECF No. 9 at 10.) However, the Fourth Circuit expressly rejected a "*per se* rule requiring remand when the ALJ does not perform an *explicit* function-by-function analysis." *Mascio*, 780 F.3d at 636; *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016) (emphasis added). Instead, the relevant question is whether the ALJ's RFC analysis includes the narrative discussion required by SSR 96-8p, and contains sufficient information to allow meaningful review. SSR 96-8p, 1996 WL 374184, at *7; *Monroe*, 826 F.3d at 189.

Here, the ALJ's decision meets this standard because it sets forth a logical explanation connecting the evidence to the ALJ's conclusion. In his detailed RFC analysis, the ALJ first acknowledged Claimant's own statements regarding his daily activities and his allegations of difficulty walking and difficulties with his right hand. (Tr. 23.) However, the ALJ concluded that Claimant's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence of record." *Id.* Instead of merely resting on this blanket assertion, however, the ALJ then devoted the next *eight* single-spaced pages of text to discussing his conclusion and explaining how the record evidence supported a reduced range of light work. (Tr. 23-30.)

First, with respect to Claimant's lumbar-spine impairment, the ALJ detailed nearly every medical appointment, noting Claimant's 2009 workplace injury, the diagnostic images and tests, his presentation at his medical appointments and consultative

examination, and his treatment history. (Tr. 23-24, 501, 699, 711, 735, 740-41, 755, 760-62, 767, 770-74, 777, 1086-87, 1106, 1109-10.) The ALJ then linked this evidence to his RFC finding, explaining that Claimant's allegations were inconsistent with examination findings which showed that he "generally ambulated with a normal gait and presented with normal lower extremity strength." (Tr. 24.) The ALJ further explained, however, that "some findings of an antalgic gait, radicular symptoms, and decreased strength due to pain support limiting [Claimant] to light exertional lifting, carrying, standing, and walking." *Id.*

Next, the ALJ discussed in detail Claimant's right wrist injury from 2016, his improvement with treatment history, his March 2016 MRI and EMG findings reflecting ulnar neuropathy, and various physical examinations from Claimant's Workers Compensation claim. (Tr. 25, 771-74, 806-07, 830-31, 848, 935, 941, 980, 1004-05, 1010, 1029, 103-32, 1049-50, 1063.) Similar to his treatment of Claimant's lumbar-spine impairment, the ALJ linked the record evidence to his RFC finding, determining in his role as the factfinder that "[c]ollectively, the record supports never allowing the claimant to climb ladders, ropes, or scaffolds due to his wrist pain and ulnar neuropathy." (Tr. 26.) The ALJ also found that Claimant could frequently operate hand controls, finger, handle, and feel with the right hand, and occasionally grip, push, pull, and reach with his right upper extremity. (Tr. 26-27.)

In addition to his consideration and discussion of Claimant's subjective statements, daily activities, and medical records, in support of this finding the ALJ also discussed at length the numerous medical opinions and prior administrative decisions and explained their persuasiveness in accordance with Agency regulations. (Tr. 26-30.) The ALJ found particularly persuasive the RFC limitations opined by the medical-expert

testimony of Dr. Owens, noting that Dr. Owens had reviewed the entire record, supported his testimony with direct references to the evidence, and that his testimony was "consistent with the longitudinal record." (Tr. 26-27, 44-45.) As such, the ALJ adopted Dr. Owens's limitations into the RFC finding.

Following his review of Claimant's subjective complaints, medical evidence, and the medical opinions and administrative findings, the ALJ concluded that Claimant had the ability to perform a reduced range of light work based on his "performance throughout the longitudinal record," which included Claimant's "performance during multiple examinations, during objective testing, and his response to treatment." (Tr. 30.) Further, the ALJ explained that his RFC determination was "generally supported by the testimony of the [two] medical experts who reviewed the file and were available for cross-examination during the hearing." *Id*. The ALJ's detailed discussion adequately met the requirement that he "build an accurate and logical bridge from the evidence to h[is] conclusion[s]" regarding the extent to which Claimant's impairments impacted his ability to engage in substantial gainful activity sufficient to permit meaningful judicial review. *Monroe*, 826 F.3d at 190.

In summary, Claimant's allegations regarding deficiencies in the ALJ's function-by-function assessment are without merit. *See Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020) (affirming where the ALJ built a "logical bridge" from the evidence to her conclusion). The ALJ's analysis permits meaningful judicial review and amply clears the "not high" bar for substantial evidence. *Biestek*, 139 S. Ct. at 1154. While the Claimant may disagree with this assessment, that does not mean that the ALJ's decision was erroneous or that the Claimant can ask this Court to reweigh the evidence to arrive at a different conclusion. The issue in this case is not whether there was substantial

evidence to support a *contrary* finding, but rather whether substantial evidence supports *the ALJ's findings. Id.*; *see also Estep v. Richardson*, 459 F.2d 1015, 1017 (4th Cir. 1972) ("if supported by substantial evidence, [the ALJ's determination] must be affirmed even though the reviewing court believes that substantial evidence also supports a contrary result"). Accordingly, the undersigned **FINDS** that the ALJ's RFC determination was supported by substantial evidence, and remand is not proper.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm her decision (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Berger.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985);

*Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: July 31, 2023

Dwane L. Tinsley
United States Magistrate Judge